IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DORINDA LOEFFLA HAWKINS,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　　　)　　　　1:21CV286
　　　　　　　　　　　　　　　　　　)
KILOLO KIJAKAZI,　　　　　　　　　)
Acting Commissioner of Social Security,[1]　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　)

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Dorinda Loeffla Hawkins ("Plaintiff") brought this action pursuant to

Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C.

§§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of

Social Security denying her claims for Disability Insurance Benefits and Disabled Widow's

Benefits under Title II of the Act and Supplemental Security Income under Title XVI of the

Act.  The parties have filed cross-motions for judgment, and the administrative record has

been certified to the Court for review.

I.　　PROCEDURAL HISTORY

Plaintiff protectively filed her application for Disability Insurance Benefits on July 22,

2019 (Tr. at 12, 333-41)[2] and applications for both Disabled Widow's Benefits and

---

[1] Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit.  Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #11].

Supplemental Security Income Benefits on June 18, 2019 (Tr. at 12, 342-58). In all applications, Plaintiff alleged a disability onset date of May 29, 2019. (Tr. at 12, 333-41, 342-58.) Her applications were denied initially (Tr. at 69-144) and upon reconsideration (Tr. at 145-222, 230-55). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 271-72.) Plaintiff, along with her attorney and an impartial vocational expert, attended the subsequent telephonic hearing on November 12, 2020. (Tr. at 12.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 34), and, on March 16, 2021, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date, May 29, 2019. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 15.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> undifferentiated connective tissue disease, inflammatory arthritis, scleroderma, chronic pain syndrome, neuropathy, meniscal tear right knee, meniscal cyst, degenerative joint disease right knee/osteoarthritis of right knee, lumbar radiculopathy, herniated nucleus pulposus L4-L5 and L5-S1 treated with laminectomy and partial discectomy, spinal stenosis, depression, mood disorder, and adjustment disorder with depressed mood[.]

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

(Tr. at 15.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 17-20.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations. Specifically, the ALJ found that Plaintiff

> can frequently, not constantly push and pull with the left upper and lower extremity; can occasionally climb, stoop, kneel, crouch, and crawl; occasional exposure to fumes, odors, dusts, gases, poor ventilation; and no exposure to hazards. [Plaintiff] can apply commonsense understanding to carry out simple one-or-two step instructions, deal with standardized situations with occasional or no variables in or from these situations encountered on the job; sustain concentration, persistence, and pace in two-hour increments; changes in work environment can be introduced occasionally; and no fast-paced production.

(Tr. at 20.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 32.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 33-34.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 34.)

Plaintiff now raises three challenges to the ALJ's decision. First, she argues that substantial evidence fails to support the ALJ's step three finding that Plaintiff's back impairment did not meet 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 1.04C ("Listing 1.04C"). Second, Plaintiff contends that substantial evidence fails to support the ALJ's RFC assessment. In particular, she asserts that the ALJ failed to provide a "logical bridge" between the evidence and her conclusions regarding Plaintiff's abilities to walk and use her neck and shoulders when performing work-related functions. (See Pl.'s Br. [Doc. #14] at 8-15.) Finally, in a related argument, Plaintiff challenges the ALJ's treatment of the medical opinions rendered by Dr.

6

Susan Rakley, the consultative examiner. (Pl's Br. at 15-23.) Because Plaintiff relies on Dr. Rakley's opinion to support her first two contentions, the Court addresses Plaintiff's arguments in reverse order.

A. Dr. Rakley's Opinion

On January 14, 2020, Dr. Rakley conducted a physical consultative examination of Plaintiff, after which she opined as follows:

> [Plaintiff] does not need an assistive device for ambulation. [She] is unable to walk a block at a reasonable pace on a rough/uneven surface. [She] is unable to climb a few steps at a reasonable pace with the use of a single handrail. [She] does not have full use of the other upper extremity for carrying objects.

> [Plaintiff's] ability to hear and speak is not impaired. [Her] ability to sit and handle objects is moderately impaired. [Her] ability to stand, move about, lift, carry, travel and stamina is severely impaired.

(Tr. at 1650.) The ALJ recounted Dr. Rakley's opinions in her decision, but ultimately found them unpersuasive. (Tr. at 29.) In particular, the ALJ noted that

> [Dr. Rakley's] own findings do not support the handling limitations as [Plaintiff] maintained full range of motion of the elbows, wrists, and fingers. Those limitations are not consistent with other exams that show [Plaintiff] was able to curl all fingers and was able to make a fist even when she had tenderness over the joints of the fingers. Additionally, her opinion regarding an inability to walk a block at a reasonable pace and climb stairs using only a single handrail is not consistent with [Plaintiff's] ability to walk a lot at her job despite her back pain and left foot drop, which were present after her surgery in 2018. Exams after the alleged onset date do not show a decline in ambulation from when she was working even though [Plaintiff] had a slow, antalgic gait or still wore the AFO brace on the left.

(Tr. at 29 (internal citations omitted).)

Plaintiff now claims that all of the ALJ's reasons for rejecting Dr. Rakley's opinions were fundamentally flawed. She first challenges the ALJ's statement that Dr. Rakley's "own findings do not support the handling limitations" in light of her exam findings noting "full

range of motion of the elbows, wrists, and fingers." (Pl.'s Br. at 18-19 (citing Tr. at 29).) Specifically, Plaintiff argues that she could maintain a normal range of motion in her hands "at the same time she feels pain in her arms and numbness in her hands from cervical stenosis" and "swelling, pain and numbness from Raynaud's disease." (Pl.'s Br. at 19.) Plaintiff also notes that Dr. Rakley's examination revealed a severely limited range of motion in Plaintiff's right shoulder, and that, without the ability to lift her arm, she clearly "does not have full use of that upper extremity for carrying objects." (Pl.'s Br. at 19.)

As an initial matter, Plaintiff appears to misinterpret both Dr. Rakley's statement regarding Plaintiff's carrying ability and the ALJ's discussion of that evidence. Plaintiff argues that the ALJ improperly rejected Dr. Rakley's finding that Plaintiff "'did not have full use of the upper extremity for carrying objects'" "'based on'" Plaintiff's normal range of motion in her elbows, wrists, and fingers "on one day." (Pl.'s Br. at 18 (citing Tr. at 29).) In fact, Dr. Rakley addressed Plaintiff's ability to carry, not when discussing her handling abilities, but in the context of ambulation. (See Tr. at 1650.) Immediately after opining that Plaintiff would have difficulty climbing steps, even with the use of a handrail, Dr. Rakley posited that Plaintiff "does not have full use of the other upper extremity for carrying objects." (Tr. at 1650 (emphasis added).) Moreover, Dr. Rakley's overall evaluation does not support Plaintiff's claims. For example, as noted by the ALJ, Dr. Rakley repeatedly noted that Plaintiff was giving "poor effort" on the consultative examination. (Tr. at 25, 1649.) Dr. Rakley's examination reflects that Plaintiff was positive for psychomotor retardation with "give away weakness." (Tr. at 25, 1649.) Plaintiff declined Range of Motion testing for her thoracolumbar spine, and lower extremity strength was "difficult to assess accurately due to give away weakness." (Tr.

at 1649.) Further, specifically as to Plaintiff's cervical stenosis, Dr. Rakley concluded that her examination of Plaintiff's shoulder and upper arm was limited, and that Plaintiff's shoulder limitations were inconsistent with her diagnoses. Specifically, Dr. Rakley found that, "[t]hough radicular pain from cervical stenosis can cause arm pain, it does not cause loss of range of motion of shoulder, nor would shoulder movement, while stabilizing the neck, be expected to increase pain." (Tr. at 1649.) Thus, Dr. Rakley concluded that Plaintiff's alleged pain and reduced range of motion could not be attributed to her cervical stenosis, and Dr. Rakley could not determine Plaintiff's prognosis in the absence of a diagnosis or explanation. (Tr. at 1649.)

Notably, the ALJ summarized Dr. Rakley's examination findings at length (Tr. at 25), and the ALJ also devoted two lengthy paragraphs in her decision to describing the nature and extent of Plaintiff's cervical impairment and related symptoms. (Tr. at 24-25.) On January 15, 2020, just one day after Plaintiff's evaluation by Dr. Rakley, Plaintiff was seen by her primary care provider, who noted that Plaintiff "appeared to be in pain and had very limited mobility in the right arm and shoulder due to pain" as well as decreased sensation on the right. (Tr. at 25 (citing Tr. at 1929-30).) However, Plaintiff maintained full strength in her extremities (Tr. at 25 (citing Tr. at 1929-30)), and after a steroid taper, Plaintiff's symptoms improved dramatically (Tr. at 25 (citing Tr. at 1921).) Also in January 2020, Plaintiff saw a new rheumatologist and on examination Plaintiff "maintained full strength and had no deformity, swelling, tenderness, effusion, warmth, or limits in range of motion of the shoulders, elbows, writs, hands, fingers, knees, ankles, feet, or toes" with "no evidence of active disease." (Tr. at 23, 25, 1654.) Plaintiff's primary care provider also referred Plaintiff to treatment at the UNC Spine Center, and in March 2020 a few weeks after Dr. Rakley's examination, Dr. Karvelas at

9

the Spine Center concluded that Plaintiff had full strength and sensation on the right, but that her left arm and left leg needed imaging because the examination of her left arm and leg was "notable for giveaway strength and is not helpful for determining true neurological weakness." (Tr. at 1696, 24.) As noted by the ALJ with respect to that subsequent imaging, "x-rays of the cervical spine in March 2020 showed only mild degenerative disc disease at C5-C6 and C6-C7." (Tr. at 25, 1714).[5]

Further, in assessing the opinion evidence, the ALJ also considered the opinion of Plaintiff's treating rheumatologist Dr. Parker, who opined that Plaintiff "was able to perform all functions of her job; did not have a full or continuous period of inability to perform job functions; and would miss 1 to 2 days of work every 2 to 3 months." (Tr. at 28, 1872.) The ALJ found that Dr. Parker's opinion that Plaintiff

> would be absent from work due to episodic flare-ups of her condition and that would cause absences of 1 to 2 times every 2 to 3 months with one day of absence involved is persuasive as it reflects the kinds of reports the claimant made to her physicians of occasional flare-ups and falls within the permissible tolerance for absenteeism as the vocational expert described because Dr. Parker essentially says the claimant will be absent one or two days every two or three months. The occasional nature of the claimant's flare-ups is consistent with the claimant's own reports of occasional flares of symptoms such as numbness and tingling in her arms and fingers. It is consistent with the claimant reporting improvement in the swelling with Prednisone or other steroids.

(Tr. at 28-29.) In rejecting any further reaching and handling limitations as "not persuasive," the ALJ specifically noted Plaintiff's reports that "when she had Raynaud's flares she had

---

[5] Although Plaintiff continued to report periodic flares in her pain level to her rheumatologist during the time period at issue (see Tr. at 25 (citing Tr. at 1825)), there is no record of further treatment by the Spine Center.

difficulty using her hands, but she described that as only occurring occasionally" (Tr. at 34), consistent with Dr. Parker's opinion evidence.

As noted above, Dr. Rakley did not expressly issue an opinion regarding Plaintiff's ability to reach.[6] Instead, Dr. Rakley noted that she was unable to fully evaluate Plaintiff's use of her shoulders because Plaintiff declined testing due to pain. (See Tr. at 1649.) Dr. Rakley also explained that she did not have a definitive diagnosis for the source of Plaintiff's severely limited range of motion in her shoulders or pain therefrom. (Tr. at 1649.) Accordingly, Dr. Rakley, by her own admission, lacked sufficient evidence to support lifting, carrying, and reaching limitations. Dr. Karvelas at the Spine Center reached a similar conclusion a few weeks later, and Plaintiff's rheumatologists did not opine any differently. In light of these findings, Plaintiff fails to show that the ALJ erred in finding Dr. Rakley's opined upper extremity limitations unpersuasive.

Plaintiff next challenges the ALJ's treatment of Dr. Rakley's opined walking restrictions. Plaintiff argues that Dr. Rakley's conclusions are consistent with records noting Plaintiff's antalgic gait and left foot drop (Pl.'s Br. at 6 (citing Tr. at 575, 576, 592, 597, 608, 612, 613, 1108, 1254, 1283, 1319, 1701)), and that Plaintiff's ability to return to work with these issues prior to her alleged onset date was not an adequate basis for discounting Dr. Rakley's opinions. In particular, Plaintiff contends that "[t]he fact that [she] returned to work after her surgery and worked despite excruciating pain has no probative value as to her ability to walk when Dr. Rakley examined her in 2020." (Pl.'s Br. at 20.) However, as noted by the ALJ throughout her decision, the extent to which Plaintiff's pain and other symptoms actually

---

[6] In fact, none of the medical opinions in this case included reaching restrictions.

limited her functioning is very much at issue in this case, and the ALJ was under no obligation to accept Plaintiff's statements regarding the intensity, persistence, or functionally-limiting effects of her pain without first considering it in the context of the record as a whole, including the objective medical evidence and the evidence of Plaintiff's other activities. See Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Here, the ALJ expressly determined that substantial evidence did not fully-support Plaintiff's allegations of disabling pain.[7] Accordingly, she was under no obligation to accept Dr. Rakley's opinions regarding Plaintiff's walking limitations, which were based almost exclusively on Plaintiff's pain allegations.

Notably, when discussing Plaintiff's lumbar spinal stenosis, Dr. Rakley noted that x-rays confirmed Plaintiff's "mild DJD and disc disease." (Tr. at 1649.) However, despite being a consultative examiner, Dr. Rakley did not actually examine Plaintiff's lumbar spine. Instead, Dr. Rakley noted that Plaintiff "declined [range of motion] testing of [her] thoracolumbar spine, saying it would be too painful." She further noted that Plaintiff's "sensation was intact" and that her lower extremity "motor strength [was] difficult to assess accurately due to give away weakness." (Tr. at 1649.) The ALJ related these findings when discussing Dr. Rakley's examination. (See Tr. at 25.) As noted above, Dr. Krevalas at the Spine Center similarly concluded that Plaintiff's lower extremity complaints could not be assessed due to her "giveaway strength" on examination (Tr. at 1696, 24.)

---

[7] The Court discusses the sufficiency of the ALJ's subjective symptom analysis in greater depth in subsection B of this Recommendation.

Plaintiff further argues that the ALJ erred by relying on the findings of State agency medical consultant on reconsideration, Dr. Celeste Williams, rather than on an examining source's findings. However, Plaintiff fails to recognize that, when assessing both her shoulder and back limitations, Dr. Rakley was forced to assess Plaintiff's RFC without the benefit of conducting a full examination.[8] Moreover, Dr. Williams specifically noted that she considered

---

[8] In addition, the most recent revisions to the regulations significantly reduce the distinction between treating, examining, and non-examining sources. Instead, under the applicable regulations for claims filed on or after March 27, 2017,

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .

> (1) Supportability.
> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
> (2) Consistency.
> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
> (3) Relationship with the claimant . . . [which includes]: (i) Length of the treatment relationship . . . (ii) Frequency of examinations . . . (iii) Purpose of the treatment relationship . . . (iv) Extent of the treatment relationship . . . [and] (v) Examining relationship. . . .
> (4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
> (5) Other factors. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in . . . [their] decisions how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2). Here, as set out above, the ALJ properly considered and articulated her reasons for finding Dr. Rakley's opinions less than fully persuasive, specifically citing the lack of examination

Dr. Rakley's opinions and found them persuasive. (Tr. at 159.) Taking Dr. Rakley's opinions and exam findings into consideration, along with the record as a whole, Dr. Williams found that Plaintiff's impairments limited her to no more than light work with occasional postural limitations, frequent pushing and pulling with the left extremities, and limited exposure to hazards and pulmonary irritants. (Tr. at 159-61.) The ALJ then adopted these findings in their entirety when assessing Plaintiff's RFC. (Compare Tr. at 20.) In short, Plaintiff points to no evidence that the ALJ failed to properly consider the persuasiveness of Dr. Rakley's opinions, let alone that such a failure rendered her RFC assessment unsupported by substantial evidence.

B. Function-by-Function Assessment

In a related argument, Plaintiff contends that the ALJ failed to properly explain her basis for concluding that Plaintiff had (1) fairly minimal upper body restrictions and (2) could perform the standing and walking requirements of light work. As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. SSR 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity In Initial Claims, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific

_____

findings other evidence to support Plaintiff's pain allegations, including her reluctance to undergo testing or to take pain medications as directed.

14

medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

Here, Plaintiff's function-by-function challenges rely almost entirely on her pain allegations. Therefore, the sufficiency of the function-by-function analysis in this case rests on whether the ALJ considered this "contradictory evidence" in accordance with the regulations. In terms of Plaintiff's upper extremity limitations, the ALJ recounted Plaintiff's testimony that

she has neck pain every day due to stenosis. She has pain with turning her head back and forth and looking down. Her neck pain is 8.5/10 every day of the week. She has problems with her left shoulder because pain from her neck radiates down to her left shoulder and arm and causes her hand to go numb. She has problems with the left shoulder every day. She has problems with right shoulder from her neck pain shooting down to her shoulder and down her arm to her fingers causing numbness. She cannot lift her arms.

(Tr. at 21 (citing Tr. at 54-55)). However, Plaintiff also told her doctor in January 2020 that she was able to perform all of her activities of daily living, including grooming and household tasks such as bed-making and laundry, which necessarily involve some degree of arm lifting and dexterity.[9] (See Tr. at 26, 1657.) Although Plaintiff correctly argues that being able to perform such tasks does not, in and of itself, support the proposition that Plaintiff "can perform the exertional demands of light work [for] eight hours a day, five days a week" (Pl.'s Br. at 11), these activities clearly undermine Plaintiff's testimony of extremely limiting pain limitations including a complete inability to lift and use her arms. As the ALJ noted multiple times, Plaintiff reported constant, severe, limiting pain, such that she refused to even attempt certain range of motion and other objective testing during her consultative exam. (Tr. at 25, 1645, 1649.) The ALJ reasonably found these assertions inconsistent with the other evidence in the record regarding Plaintiff's activities. As the ALJ also noted, other testing showed decreased range of motion and weakness due to pain, rather than any underlying impairment(s). (See Tr. at 23, 26.)

Overall, the ALJ acknowledged that many of Plaintiff's severe impairments caused Plaintiff to experience some degree of functionally-limiting pain. The ALJ explained that

---

[9] When asked by the ALJ how high she could lift her left arm and right arm, Plaintiff replied, "I can't." (Tr. at 55.)

Plaintiff "can frequently, not constantly[,] push and pull with the left upper and lower extremities due to radicular symptoms" and that "[t]he reduction to lifting and carrying at the light level is sufficient to account for the alleged numbness, tingling, swelling, and pain in the hands." (Tr. at 26.) However, Plaintiff argues that the ALJ provided no explanation as to if or how the RFC accounts for Plaintiff's pain-limited range of motion in her neck and left shoulder or her occasional pain with limitation of motion in her hands, right shoulder, and elbows. Although Plaintiff correctly notes that pain must be considered when assessing both her subjective complaints and the RFC, in the present case, the ALJ ultimately determined that the record as a whole failed to support Plaintiff's allegations of disabling pain and other symptoms.

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, [such as pain,] be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; 20 C.F.R. § 404.1529. An ALJ should not reject a claimant's statements "about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2). Thus, "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." Lewis v. Berryhill, 858 F.3d 858, 866 (4th Cir. 2017). However, it is also undisputed that a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as

17

pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Thus, objective medical evidence and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs [the] ability to work" and "[a]lthough a claimant's allegations about . . . pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595); see also SSR 16-3p ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities. . . ."). According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities. . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities. . . .

SSR 16-3p.

In the present case, a thorough review of the ALJ's decision and the record as a whole reveals that the ALJ properly considered objective medical evidence and other evidence and explained that determination in the decision. In evaluating the evidence, the ALJ specifically

noted, as set out in subsection A, above, that Plaintiff's impairments could reasonably cause some degree of pain and limitation in her upper extremities, particularly on her left side, where she experienced radicular symptoms with occasional flares in severity. However, as Dr. Rakley noted, Plaintiff's documented impairments failed to explain the extreme, pain-limited limitation of motion she reported in her shoulders. (Tr. at 1649.) As also noted above, the ALJ described the nature and extent of Plaintiff's cervical impairment and related symptoms at great length. (Tr. at 24-25.) In particular, the ALJ recounted that Plaintiff maintained full strength in her extremities, that her periodic flares in pain were successfully treated with steroid tapers (Tr. at 25), that imaging reflected only mild findings, and that Plaintiff declined to take all recommended pain medications (Tr. at 23, 24, 25). By describing these findings, along with Plaintiff's daily activities, the ALJ adequately accounted for the upper-body limitations included in the RFC assessment, and set out the basis for the determination, finding that the "reduction to lifting and carrying at the light level is sufficient to account for the alleged numbness, tingling, swelling, and pain in the hands," and with a further limitation to only frequent pushing and pulling with the left upper extremity "due to radicular symptoms" and in light of Plaintiff's "testimony that her neck pain radiates mainly down her left upper extremity." (Tr. at 26, 31.)

Similarly, in terms of her ability to stand and walk, the ALJ included undifferentiated connective tissue disease, inflammatory arthritis, scleroderma, chronic pain syndrome, neuropathy, and spinal stenosis among her severe impairments at step two of the sequential analysis. In making this finding, the ALJ acknowledged that all of the above impairments had more than a minimal impact on Plaintiff's ability to perform basic work activities. However,

19

as explained by the ALJ in her decision, it does not necessarily follow that these impairments specifically impacted Plaintiff's ability to stand and walk beyond the included restriction to light work. In fact, the ALJ recounted Plaintiff's allegations of standing, sitting, and walking limitations related to her back and other physical impairments at great length but found, based on the evidence as a whole, that the intensity, persistence, and limiting effects of Plaintiff's impairments was not as extensive as she alleged.

> At the hearing, Plaintiff testified that
>
> [s]he has spinal stenosis and great pain in the lower part of her back that radiates to her buttocks, shoots to her knee and runs down her leg. Her back pain is 9/10. She wears a back brace every day to keep her back aligned. She has arthritis in her right knee. It swells and causes difficulty walking. She has problems with her left knee due to pain from the spinal stenosis radiating to it. She has a drop foot on the left and has to watch herself from stumbling. She wears a brace. This happened after her spinal surgery [in 2018]. She can walk 25 to 50 feet at one time due to pain in her back and legs as well as shortness of breath.

(Tr. at 21.) Notably, in terms of Plaintiff's right knee pain, the ALJ noted that "the evidence does not describe any treatment for [Plaintiff's] right knee during the relevant period." (Tr. at 23.) The ALJ also noted that Plaintiff demonstrated an antalgic gait at most, in not all, of her medical appointments and also wore a back brace and an AFO on her left foot following her 2018 surgery. (Tr. at 21, 24.) These findings, in and of themselves, establish that Plaintiff experienced pain when walking. The remaining questions, therefore, are (1) whether the evidence shows that Plaintiff's impairments, or pain therefrom, required standing and walking restrictions beyond those included in the RFC, and (2) whether the ALJ adequately explained the bases for these restrictions in her decision.

20

In finding that Plaintiff remained able to stand and walk for up to six hours in an eight-hour workday, the ALJ stressed that Plaintiff was able to "walk a lot on her job" prior to her alleged onset date, and that "objective imaging does not show a significant decline or progression of the degenerative changes of the back after [Plaintiff] stopped working." (Tr. at 25, 1490, 1533.) Although Plaintiff argues that this finding is inapposite, as discussed in subsection A, Plaintiff's ability to perform work, particularly work at a higher exertional level, just prior to her onset date, and without any notable change in her impairments, counters her present argument that pain when walking, standing, and sitting prevents her from performing work activity of any kind.

As with Plaintiff's upper-body arguments, Plaintiff's own statements also undermine her contentions. In July 2019, Plaintiff "reported [that] she remained active around the house with household chores and walked steps, but did not do too strenuous of activity due to her medical conditions. Furthermore, she reported being able to do all activities of daily living in January 2020." (Tr. at 26, 1659, 1952.) The ALJ concluded that nonstrenuous household chores were "not inconsistent with the reduced range of light work described" in the RFC. (Tr. at 26.) Notably, this finding is consistent with the findings of the State agency medical consultants, both of whom reviewed all of the medical evidence of record and opined that Plaintiff could perform light work despite her impairments. (Tr. at 30-31.) As noted above, the ALJ also relied on the opinion evidence from Plaintiff's treating rheumatologist Dr. Parker, who opined that Plaintiff "was able to perform all functions of her job; did not have a full or continuous period of inability to perform job functions; and would miss 1 to 2 days of work every 2 to 3 months." (Tr. at 28, 1872.) The ALJ nevertheless included the limitations set

Case 1:21-cv-00286-LCB-JEP   Document 17   Filed 08/30/22   Page 21 of 25

out in the RFC, which were consistent with the limitations opined by Dr. Williams, to address Plaintiff's severe impairments, including the specific postural limitations to address her spine and knee impairments, and limitations on exposure to fumes, odors, dusts, and gases to address her respiratory and cardiac impairments. (Tr. at 26, 30.) The ALJ specifically noted that Plaintiff's antalgic gait from her left foot drop and her use of an AFO brace were addressed by the postural limitations, and with the reduction in pushing and pulling. (Tr. at 30-31.) The ALJ also made further specific findings as to why no further restrictions were required, including Plaintiff's full strength and "only giveaway weakness on exams." (Tr. at 26.) The ALJ also explained that the "additional restrictions to occasional changes and no fast-paced production" also accounts for Plaintiff's pain. (Tr. 32.) Plaintiff relies solely on her allegations of radiating pain and shortness of breath to support her argument that she is unable to perform the standing and walking requirements of light work. Because the ALJ presented and discussed ample evidence to the contrary, and explained her reasons for discounting it and for ultimately adopting the RFC here, substantial evidence supports the ALJ's function-by-function analysis and the RFC as a whole.

C.      Listing 1.04C

Finally, Plaintiff contends that substantial evidence fails to support the ALJ's finding at step three of the sequential analysis. Specifically, Plaintiff argues that the ALJ failed to properly evaluate her back impairment against the requirements of Listing 1.04C. To meet Listing 1.04, a claimant first must show a disorder of the spine, such as a "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [and/or] vertebral fracture . . . resulting in compromise of a nerve root (including the

22

cauda equina) or the spinal cord." 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 1.04. To meet part C of the Listing, she then must demonstrate "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 1.04C. Notably, section 1.00B2b(1) further specifies that

> [i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 1.00B2b(1). Section 1.00B2b(2) then goes on to provide "examples of ineffective ambulation," which

> include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 1.00B2b(2).

In the present case, the ALJ determined at step three of the sequential analysis that the record failed to reflect "lumbar spinal stenosis resulting in pseudoclaudication with an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (Tr. at 17.) The ALJ specifically explained that "[i]n this case, the evidence does not demonstrate that [Plaintiff] has . . . the degree of difficulty in ambulating as defined in 1.00B2b." (Tr. at 17.) Plaintiff points to the opinion of the consultative examiner, Dr. Rakley, as supportive of Plaintiff's inability to ambulate effectively. As set out in subsection A above, Dr. Rakley opined that Plaintiff "is unable to

23

walk a block at a reasonable pace on a rough/uneven surface" and "is unable to climb a few

steps at a reasonable pace with the use of single handrail." (Tr. at 1650.) Plaintiff further

argues that Dr. Rakley's conclusions are consistent with records noting Plaintiff's antalgic gait

and left foot drop. (Pl.'s Br. at 6 (citing Tr. at 575, 576, 592, 597, 608, 612, 613, 1108, 1254,

1283, 1319, 1701).) However, as the Court previously noted, the ALJ explained that Dr.

Rakley's

> opinion regarding an inability to walk a block at a reasonable pace and climb
> stairs using only a single handrail is not consistent with [Plaintiff's] ability to
> walk a lot at her job despite her back pain and left foot drop, which were present
> after her surgery in 2018. . . . Exams after the alleged onset date do not show a
> decline in ambulation from when she was working even through [Plaintiff] had
> slow, antalgic gait or still wore the AFO brace on the left.

(Tr. at 29.) The ALJ also set out at length throughout the decision the other opinion evidence,

imaging, examination results, activities, and other evidence supporting the conclusion that Dr.

Rakley's opinion was not persuasive, including the unsupportability and inconsistency in light

of Dr. Rakley's own examination and the other contemporaneous examinations and opinions

in the record, as discussed at length in Section A above. Moreover, neither Dr. Rakley nor

any other source opined that Plaintiff required an assistive device for ambulation, let alone

one that "limits the functioning of both upper extremities." See Jones v. Berryhill, 681 F.

App'x 252, 255 (4th Cir. 2017) (holding that the plaintiff's "occasional use of a single cane

[did] not qualify as 'inability to ambulate effectively' which . . . is defined by regulation to

require two-handed assistance with walking") (citing 20 C.F.R., Pt. 404, Subpt. P, Appx. 1,

§ 1.00B2b). Because substantial evidence supports the ALJ's finding that Plaintiff did not meet the ambulatory requirements of Listing 1.04C, the Court finds no basis for remand.[10]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #15] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 30th day of August, 2022.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge

---

[10] The SSA amended the listings shortly after the ALJ issued her decision, resulting in Listing 1.04 being eliminated and new listings and qualifying criteria being established. Under the revised listings, Listing 1.16 pertains to "Lumbar spinal stenosis resulting in compromise of the cauda equina." See 85 Fed. Reg. 78164-01, 2020 WL 7056412 (Dec. 3, 2020); compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(C), with 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.16 (effective April 2, 2021). The new listing applies to both new applications filed on or after April 2, 2021, as well as to claims that are pending with the SSA on or after that date. The Court must consider the present case based on the version of the regulations in effect at the time of the ALJ's decision. 85 Fed. Reg. 78164-01, n.2 ("[W]e will use these final rules on and after their effective date in any case in which we make a determination or decision. We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). However, the Court notes that, if remanded, Plaintiff's lumbar spinal stenosis would be considered against the following requirements of Listing 1.16:

> D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:
>
> 1. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
>
> 2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)).

Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 Fed. Reg. 78164-01, at *78180, 2020 WL 7056412 (Dec. 3, 2020); see also 85 Fed. Reg. 78164, n.2 ("If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand."). Because Listing 1.16 requires the documented medical need for an assistive device, it appears that this regulatory change would have no impact on the outcome of Plaintiff's listing claim.